IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **FCSTONE MERCHANT SERVICES, LLC** | § § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | Civil Action No. |
| **SGR ENERGY, INC. and ST SHIPPING & TRANSPORT PTE LTD,** | § § § § | |
| *Defendants*. | § § § | |

**PLAINTIFF'S VERIFIED COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR INJUNCTIVE RELIEF**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

COMES NOW, Plaintiff, FCStone Merchant Services, LLC ("Plaintiff"), and files this *Verified Complaint, Application for Temporary Restraining Order and Preliminary Injunction and Request for Injunctive Relief* ("Verified Complaint") against SGR Energy, Inc. ("SGR" or the "Customer"), and ST Shipping & Transport Pte Ltd. ("STS" and together with SGR, the "Defendants"), and in support thereof, respectfully alleges and shows the Court as follows:

### I. INTRODUCTION

1. Plaintiff brings this action seeking to recover damages incurred as a result of SGR's breach of a valid and enforceable Master Purchase and Sale Agreement between Plaintiff and SGR, whereby Plaintiff sold forward more than 80,632 barrels of domestic crude oil to SGR for which

1

payment by SGR remains outstanding, and for injunctive relief[1] to prevent further damages to Plaintiff's domestic crude oil and the vessel transporting the same, operated by STS, as such damages are imminent and will cause irreparable injury.

## II. PARTIES

2.  Plaintiff is a limited liability company existing under the laws of the State of Delaware with its principal place of business in Kansas City, Missouri.

3.  SGR is a Texas corporation located at 3707 Cypress Creek Parkway, Suite 500, Houston Texas, 77068, doing business in the State of Texas within this district, and can be served with process through its registered agent for service, Thomas San Miguel at its registered office address: 3707 Cypress Creek Parkway, Suite 500, Houston Texas, 77068.

4.  STS is a company organized and existing under the laws of Singapore, with a registered office at 1 Temasek Avenue, #34-01 Millenia Tower, Singapore 039132.

## III. JURISDICTION AND VENUE

5.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars $75,000.00.

6.  Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 1391(b) because: (1) this lawsuit is founded upon a written contract expressly providing for venue in this District; (2) SGR, who owes under the subject contract, is based and doing business in this district; (3) STS who is presently in control of the subject commodity does business in this district; and (4) it is the district in which the charter of the commodity originated.

---

[1] A temporary restraining order can be filed with the plaintiff's complaint or as a separate motion. *See Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1155 (5th Cir. 1992).

## IV.  FACTUAL BACKGROUND

### A.  The Parties

7.  Plaintiff is a commodity marketing and arbitrage company. It offers inventory repurchase agreements, transactional commodity financing arrangements, and processing and tolling arrangements.

8.  Defendant SGR is a heavy fuel blending, sales, distribution, marketing and trading company for traditional petroleum commodities and renewable fuels.

9.  STS is a shipping and transport wholly-owned subsidiary of Glencore International AG, a multinational commodity trading and mining company with headquarters in Baar, Switzerland.

### B.  The Agreement

10.  On or around September 3, 2019, Plaintiff and SGR entered into a Master Purchase and Sale Agreement (hereinafter, the "Agreement") to govern each transaction between Plaintiff and SGR for the purchase and sale of crude or refined petroleum products. *See Master Purchase and Sale Agreement*, attached hereto as **Exhibit A**.

11.  The Agreement governed transactions between Plaintiff and SGR whereby Plaintiff would assist SGR in meeting its working capital needs by purchasing (with a direct cash payment to SGR) inventory held by SGR or aggregating inventory from third parties and holding title to all such inventory until SGR could arrange for the purchase of the same by an end-buyer.

12.  Pursuant to Section 2.4 of the Agreement, on or around the date on which Plaintiff would purchase petroleum commodities from SGR or from third parties on behalf of SGR, SGR and Plaintiff would enter into a forward sale contract whereby SGR would commit to purchasing the petroleum commodities within a fixed window of time in the future. This structure ensured that

if SGR were unable to find an end-buyer for such petroleum commodities and consummate its forward purchase obligations to Plaintiff, Plaintiff would be free to market the petroleum commodities directly to third party buyers in the market without SGR's intervention.

13. In the normal course of business, the commodities, to which Plaintiff held valid title pursuant to the Agreement, would be transported to a location where SGR arranged the sale of the commodities to an end-buyer. SGR would pay Plaintiff for the petroleum commodities prior to the transfer of title to the commodities from Plaintiff to SGR pursuant to their forward sale agreement. Only then, as a result of the sale arranged by SGR, would the title to the commodities transfer to the end-buyer.

14. Under the Agreement, SGR is obligated to pay Plaintiff for its costs and risks in originally purchasing the commodities in each of the transactions, which are priced as of the trade dates. *See* **Ex. A** at Section 2.1(a).

15. More specifically, pursuant to Section 2.1(c) of the Agreement, SGR promised to timely pay against Plaintiff's invoices for specified commodity purchase transactions, including invoices pursuant to the following Sale Contracts for 80,683.2 barrels of domestic crude oil: (1) MIA78169A; (2) MIA78745; and MIA78501 (collectively, the "Confirmations"), attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D,** *respectively*.

16. Per the Confirmations, two voyages (discussed in more detail below) to transport domestic crude oil were arranged: (1) a voyage to transport 160,000 barrels of crude oil from Point Comfort, Texas to Barranquilla, Colombia, which began on April 3, 2020 and was completed and fully discharged on June 15, 2020 (the "First Voyage"); and, (2) a voyage to transport an additional 160,000 barrels of crude oil from Point Comfort, Texas to Barranquilla, Colombia which began on July 9, 2020 and has yet to be discharged (the "Second Voyage").

4

**C. The First Voyage**

17. As memorialized in the Confirmations, Plaintiff and SGR agreed upon a transaction whereby Plaintiff would sell forward barrels of domestic crude oil (the "Commodity") for which SGR would arrange the trade and make payment to Plaintiff.

18. On April 3, 2020, 160,000 barrels of the Commodity were loaded onto a vessel known as Miss Claudia, IMO: 9293959, MMSI 538004072 (hereinafter, the "Vessel"). *See Bills of Lading*, attached hereto as **Exhibit E**.

19. The Commercial Operator of the Vessel is STS. *See Intertanko Chartering Questionnaire*, attached hereto as **Exhibit F**.

20. On April 3, 2020, Plaintiff notified SGR that it was at "maximum account receivable" pursuant to the Agreement, and SGR would need to provide Plaintiff with payment and/or security to release the Vessel when it arrived at its destination, Barranquilla, Colombia. *See April 3, 2020 e-mail*, attached hereto as **Exhibit G**.

21. Accordingly, and prior to the arrival of the Commodity in Colombia, SGR made a partial payment to Plaintiff, with the remainder owed and due on credit.

22. On May 20, 2020, Plaintiff informed SGR that to discharge the Vessel, additional security would be required, in accordance with the Agreement.

23. On June 11, 2020, in order to discharge the Vessel, SGR agreed to post cash in excess of its credit line.

24. The Vessel transported the Commodity to Barranquilla, Colombia, and subsequently discharged the Commodity on June 15, 2020.

25. On information and belief, SGR delayed discharge of Commodity on the Vessel due to a lack of space at the Barranquilla, Colombia arrival Terminal because SGR was still holding prior inventory.

**D. The Second Voyage**

26. On or about July 9, 2020, the Vessel was loaded with the approximately 160,000 barrels of the Commodity in Point Comfort, Texas and embarked its journey to Barranquilla, Colombia. *See Bills of Lading*, attached hereto as **Exhibit H**.

27. On July 15, 2020, the Vessel arrived near Barranquilla, Colombia, but did not dock or discharge its cargo in Colombia.

**E. The Vessel**

28. STS served as the Commercial Operator for the Vessel of the Second Voyage (the "Charter"). *See Intertanko Chartering Questionnaire*, attached hereto as **Exhibit E**.

29. Because SGR did not order the Vessel to unload and did not dock on July 15, 2020, demurrage fees from the Charter have been incurred by SGR and continue to accrue from that date.

30. As of October 12, 2020, the demurrage fees amounted to $1,715,093.75. *See Invoice to SGR from STS*, attached hereto as **Exhibit J**, and *Laytime Calculation attached hereto as* **Exhibit K**.

31. Additionally, the cost of the Charter is $450,000.00. *See Id*.

32. To discharge the Commodity from the Vessel, the Charter requires payment in excess of $2,165,093.75, inclusive of the demurrage fees and the Charter cost, all payable by SGR. *See Id*.

33. Specifically, the Agreement states, "Customer shall be responsible *for **all fees and charges with the In-Transit Commodity, including but not limited to any freight and terminal***

***handling costs, demurrage,*** marine insurance, costs associated with moving the Eligible Commodity into an Approved Storage Tank and any related inland transportation costs…" *See* **Ex. A**, Section 2.2(h) (emphasis added).

### F. SGR's Nonpayment under the Agreement

34. Following the discharge of the Commodity in Colombia for the First Voyage, on July 16, 2020, Plaintiff invoiced SGR in the amount of $2.4 million, the price of the Commodity.

35. In response, SGR requested that their June 11, 2020 payment be applied against this amount, to which Plaintiff agreed and re-invoiced the amount outstanding and owed by SGR.

36. On July 24, 2020, SGR advised Plaintiff that it would be delayed in making payment to Plaintiff because its own customers were slow to pay. *See 7/24/20 email from SGR*, attached hereto as **Exhibit L**. Importantly, this was not a contractual or legal pre-condition to SGR's obligation to timely pay Plaintiff pursuant to the Agreement.

37. On July 29, 2020, SGR represented to Plaintiff that Plaintiff would receive payment by July 31, 2020. *See 7/29/20 email from SGR*, attached hereto as **Exhibit M**.

38. Thereafter, SGR continuously and repeatedly delayed its payment obligations in breach of the Agreement, each time providing reassurances that payment would soon be made. *See Additional E-mails from SGR*, attached hereto as **Exhibit N**.

39. In relevant part, the timeline of SGR's payment assurances are as follows:

   a. July 21, 2020: "We are expecting a payment for the crude this week and will pay this invoice as soon as that is received."

   b. July 29, 2020: "The payment will be made on Friday. I apologize again for the delay. We are waiting on two big wires that we have been assured we will receive Friday."

   c. July 31, 2020: "None of the wires I've been waiting on are coming in today ***and I'm very extended…Since late March I've had a lot more going out than coming in…I hope you and FCS will continue to work with me…***"

7

    d.   August 3, 2020: "I believe we should get enough in this week to pay the balance for the first 80KB."

    e.   September 25, 2020: "I'm trying to get in what I need to get this paid by Wednesday. I apologize for the delay."

40.    On October 1, 2020, a lunch meeting took place between Plaintiff and SGR at which SGR communicated that they would not pay the amount outstanding and owed by SGR to Plaintiff, in breach of the Agreement.

### G. Default.

41.    SGR has failed to timely pay and tender to Plaintiff the sum of **$3,059,195.23 USD**, which has been validly invoiced, is due and owing pursuant to the Agreement and the Confirmations (collectively, the "Defaulted Obligations), plus interest at the maximum rate permitted by Section 3.6 of the Agreement. *See Invoice No. 131305 dated 9/3/20*, attached hereto as **Exhibit O**; *see also*, **Ex. A** at Section 3.6.

42.    On October 8, 2020, Plaintiff provided SGR with notice of an Event of Default pursuant to Section 7.1 of the Agreement. *See Notice of Default*, attached hereto as **Exhibit P**.

43.    As of October 16, 2020, SGR continued to be in default under the Agreement, and as such, Plaintiff provided SGR with a Notice of Early Termination of the Agreement. *See Notice of Early Termination*, attached hereto as **Exhibit Q**. Pursuant to Article 7 of the Agreement, Plaintiff is entitled to immediately liquidate all transactions for the purchase and sale of commodities under the Agreement due to Defendant SGR's breach thereof.

### H. The Commodity and Risk of Diminution

44.    The Commodity, which is crude oil, is a diminishing asset and has a shelf life of a time certain.

45.    The Commodity has been aboard the Vessel since July 9, 2020.

46. The Vessel has been anchored near the port at Barranquilla, Colombia since July 15, 2020.

47. Crude oil is subject to spoliation and diminution in value. Specifically, crude oil always contains a residual amount of water, sulfur and other chemicals. Over long periods of time, unless sufficiently agitated or stirred on a regular basis, this residual water, sulfur and other chemicals may vaporize and condense on the interior of the Vessel's cargo tanks, causing damage to the Vessel's liner and altering the chemical composition of the crude oil to less valuable, non-market quality standards.

48. Given the extended period of time during which the Vessel has been anchored near the port of Barranquilla, Colombia and its warm, tropical climate that would facilitate vaporization, there are legitimate concerns that the Vessel's Commodity may be near spoliation or actually spoiled due to the lack of sufficient agitation over an extended period of time.

49. Moreover, the longer the Commodity is subjected to the climate of Colombia – and not discharged from the Vessel – the more likely it will become a negative asset with negligible quality or value add, and Plaintiff will be forced to dispose of the Commodity in accordance with governing environmental protocols, an extremely costly and time-consuming process that would cause material harm to Plaintiff, Defendants, and very likely, the people of Colombia and the natural environment.

50. Furthermore, the market for crude oil is uncertain and subject to volatility. There is a high degree of price risk in continuing to hold the Commodity aboard the Vessel, which can only be mitigated by selling such quantities as promptly as possible.

51. Accordingly, time is of the essence.

I. Loss Mitigation Provisions under the Agreement

52. Pursuant to Section 7.10 of the Agreement, Plaintiff has a duty to mitigate its damages and "use commercially reasonable efforts to minimize any damages it may incur as a result of an Event of Default involving the other Party." *See* **Ex. A.**

53. The Agreement also provides that "…the Non-Defaulting Party in its sole discretion shall be entitled to sell, at the Defaulting Party's sole cost and expense, any Applicable Title Document or Bills of Lading associated with any Eligible Commodity in accordance with accepted industry rules and practices…" *See* **Ex. A, Section 7.8**.

54. Given SGR's default under the Agreement, Plaintiff is entitled to, and in fact *required* to invoke these provisions.

55. However, SGR's nonpayment to the Charter restrains Plaintiff from taking control of the Commodity, in which it retains valid title.

### J. SGR's Financial Condition

56. SGR's financial instability creates additional concerns as it is entirely unclear when SGR will pay the Charter such that the Vessel can be properly discharged.

57. Dunn & Bradstreet's has rated SGR as a "high risk level," with "significant financial stress and behavior concerns" and "very high potential for severely delinquent payments." *See D&B Report*, attached hereto as **Exhibit R**.

58. Additionally, SGR has no plans to pay Plaintiff under the terms of the Agreement.

59. Specifically, through correspondence and oral communications, Defendant SGR has advised it is near insolvent.

60. In light of the foregoing and SGR's probable declining financial state, Plaintiff seeks to take control of the Commodity and direct its sale and disposition as soon as practicable.

### V. <u>CAUSES OF ACTION</u>

### A. Count One: Breach of Contract by SGR

61. Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

62. Plaintiff and Defendant entered into a valid and enforceable contract for the purchase and sale of crude or refined petroleum products memorialized by the Agreement and subsequent Confirmations, as defined above. *See* **Exs. A, B, C and D.**

63. SGR breached the Agreement by failing to pay amounts due and owing under the Agreement.

64. As a result of Defendant's breach, Plaintiff has suffered damages including, but not limited to, amounts owed under the Agreement, losses sustained for diminishing assets, attorney's fees, interest and costs.

### B. Count Two: Attorneys' Fees as to SGR.

65. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

66. Plaintiff is entitled to recover reasonable and necessary attorney's fees under the Agreement and Texas Civil Practice and Remedies Code Chapter 38 because Plaintiff has asserted claims for breach of contract.

67. Moreover, the Agreement provides for the recovery of all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party. *See* **Ex. A**, Sections 7.9, 7.11 *et. seq*.

## VI. CONDITIONS PRECEDENT

68. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

### VII. APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR INJUNCTIVE RELIEF
### (As to all Defendants)

69. Plaintiff hereby alleges and incorporates by reference each and every one of the preceding paragraphs as if they were set forth fully herein.

70. Defendants are presently holding, using, transporting and destroying the Commodity.

71. Defendants will not return the Commodity or otherwise discharge of the Commodity, despite Plaintiff's rightful title to the Commodity.

72. Accordingly, injunctive relief is needed.

73. A temporary restraining order may be issued if: "(A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *See* Fed. R. Civ. P. 65(b)(1).

74. The facts set forth in this Verified Complaint support the issuance of a temporary restraining order[2].

75. Unless Defendants are enjoined from holding, using, transporting or destroying the Commodity on the Vessel without properly discharging same, Plaintiff will be irreparably harmed having its Commodity, a diminishing asset, continue to decrease in value, inevitably spoiling as time passes each day, potentially becoming a negative asset in that Plaintiff will be burdened with

---

[2] Under federal law, there are four requisite elements to necessitate a temporary restraining order. A court may grant such relief when it is established that: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the relief is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the relief will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc).

disposing of the Commodity in accordance with applicable and governing environmental laws and statutes, an undeniably costly and timely protocol.

76. Moreover, SGR's conduct, together with its declining financial state establishes it will likely hide, harm sell or destroy the Commodity, thereby preventing Plaintiff from adequately recovering its monetary damages. This favors injunctive relief. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (finding that the "dissipation of assets…would impair the court's ability to grant an effective remedy."); *see also*, *Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-CV-00992, 2017 WL 3209522, 2017 Dist. LEXIS 174549 at *9 (N.D. Tex. 2017) (finding irreparable injury where plaintiff's rights would be "forever lost" if indemnitors disposed collateral assets or lacked ability to pay a judgment.).

77. The continuation of the holding, transporting, or destroying of the Commodity by the Defendants will result in substantial loss, which is unascertainable at this point in time, and future economic loss which is presently incalculable, especially given fluctuations in the economy.

78. Plaintiff has no adequate remedy at law for the present holding of Plaintiff's Commodity, in which Plaintiff has title to, as money damages are not adequate to compensate for the present and ongoing harm caused by same.

79. The public interest favors entry of an injunction to uphold the sanctity of contract and protect the legitimate interests of Plaintiff, the environment and the public at large.

80. This Verified Complaint also supports a preliminary injunction. A party is entitled to a preliminary injunction upon showing: "(1) a substantial likelihood that he will prevail on the merits; (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted; (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest." *Defense*

*Distributed v. U.S. Department of State,* 838 F.3d 451, 456-57 (5th Cir. 2016). These elements are also met here.

81. There is a substantial likelihood that Plaintiff will prevail on the merits of its claim against SGR, specifically Plaintiff's breach of contract claims.

82. As discussed above, Plaintiff will suffer immediate and irreparable injury unless the Defendants are immediately restrained from holding, transporting or destroying the Commodity.

83. Plaintiff has no adequate remedy at law for the irreparable harm it will suffer if it cannot recover the Commodity. *See Hartwell v. Lone Star PCA*, 528 S.W.3d 750, 769 (Tex. App. Texarkana 2017, pet. abated) (upholding temporary injunction where lender faced "the risk of irreparable injury in the future from further dissipation of its collateral and loss on the loans").

84. Plaintiff's threatened injury outweighs the threatened harm to the Defendants because Plaintiff has superior rights and title to the Commodity, and thus, an immediate right to possession. Further, as discussed above, injunctive relief will not disserve the public interests for an additional reason in that it would preserve the Commodity pending final judgment.

85. While Plaintiff is willing to post a bond to support injunctive relief, it submits the bond required should be nominal given the overarching interest Plaintiff has in the Commodity, as noted by its title to same. The Defendants, by contrast, have no property interest in the Commodity.

86. Plaintiff has a clear legal right to the requested injunctive relief.

## PRAYER

**WHEREFORE**, Plaintiff prays that the Defendants be served with the citation and Complaint, be commanded to appear herein, and the Court enter a judgment and/or an order as follows:

1. The entry of a temporary restraining order:
    a. immediately requiring Defendants to make available the Commodity or discharge to Plaintiff the Commodity and assets on the Vessel safely and without any damage to same whereby Plaintiff would determine the terms of the discharge;
    b. Immediately enjoining and restraining Defendants or anyone acting or participating by, through or in concert with them from:
        i. transporting, using, pledging, encumbering, selling, transferring or disposing of the Commodity either in operation of their business or otherwise, except as may be necessary to move or transport the Commodity to comply with this Order; or
    c. after notice and a hearing, issue a preliminary injunction granting the same relief as requested in (1) above;
    d. after a trial on the merits, issue a permanent injunction granting the same relief as requested in (1) above.
2. An entry of judgment against Defendants on each count of this Complaint;
3. An order requiring SGR to pay all amounts outstanding and owed to Plaintiff under the Agreement;
4. Award Plaintiff its actual and consequential damages;
5. Award Plaintiff its reasonable and necessary attorneys' fees incurred in or related to this action;
6. Award Plaintiff its pre- and post-judgment interest at the highest rate allowable by law;
7. Award Plaintiff interest permitted at the maximum rate pursuant to the Agreement;
8. Award Plaintiff its costs of court;

9. Grant all other and further relief both in law and in equity to which Plaintiff may show itself justly entitled.

Dated this 27th day of October, 2020.

Respectfully submitted,

/s/ Yasser A. Madriz
**Yasser A. Madriz (lead attorney)**
State Bar No. 24037015
Federal Bar No. 39080
ymadriz@mcguirewoods.com
**Miles O. Indest**
State Bar No. 24101952
Federal Bar No. 3070349
mindest@mcguirewoods.com
**McGuireWoods LLP**
600 Travis Street, Suite 7500
Houston, Texas 77002
T: 713-353-6681
F: 832-255-6381

**Addison E. Fontein**
State Bar No. 24109876
Federal Bar No. 3530304
afontein@mcguirewoods.com
**McGuireWoods LLP**
2000 McKinney Ave., Suite 1400
Dallas, Texas 75201
T: 214-932-6436
F: 469-372-3891

*ATTORNEYS FOR PLAINTIFF, FCSTONE MERCHANT SERVICES, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FCSTONE MERCHANT SERVICES, LLC | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **Civil Action No.** |
| SGR ENERGY, INC. and ST SHIPPING & TRANSPORT PTE LTD, | § § § § | |
| *Defendant .* | § § § | |

**VERIFICATION**

STATE OF Missouri §
§
COUNTY OF Jackson §

The undersigned, Scott Thein, Vice President and Risk Counsel of StoneX Group Inc., formerly known as INTL FCStone, Inc., being duly sworn on his oath, does hereby state as follows:

"My name is Scott Thein. I am over the age of 18 years old, of sound mind and fully qualified to make this verification. I have read the foregoing *Plaintiff's Verified Complaint, Application for Temporary Restraining Order and Preliminary Injunction and Request for Injunctive Relief*, and I declare under the penalty of perjury that the facts contained within the pleading are true and correct."

BY: /s/ Scott Thein
Scott Thein

DATE: 10-27-2020