**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **FCSTONE MERCHANT SERVICES, LLC** | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 4:20-cv-03693** |
| | § | |
| **SGR ENERGY, INC., ST SHIPPING & TRANSPORT PTE LTD, and THOMAS SAN MIGUEL, individually,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff, FCStone Merchant Services, LLC ("Plaintiff"), files this *Second Amended Complaint* ("Amended Complaint")[1] against SGR Energy, Inc. ("SGR" or the "Customer"), ST Shipping & Transport Pte Ltd. ("STS"), and Thomas San Miguel ("San Miguel," and together with SGR and STS, the "Defendants") and, in support thereof, respectfully states:

## I.  INTRODUCTION

1.      Defendants' two voyages, which delivered Plaintiff's crude oil from Texas to Colombia, have caused over $5,000,000 in damages.  Plaintiff seeks to recover these damages—caused by Defendants' unpaid invoices, misrepresentations and delays, and excessive fees.  First, Plaintiff seeks to recover damages caused by SGR's failure to pay Plaintiff for more than 80,632 barrels of crude oil, which breached their Master Purchase and Sale Agreement.  Second, Plaintiff

---

[1] Pursuant to the Court's July 14, 2021 Order [Dkt. No. 48], FMS was granted leave to amend its declaratory judgment action as to STS, and therefore, this amendment is timely.

seeks to recover damages caused by STS's purposeful delay in unloading the vessel and its scheme to charge excessive fees, which Plaintiff paid under protest to avoid the continuing, irreparable harm to its depreciating assets.  Third, Plaintiff seeks to recover damages caused by San Miguel, Chief Executive Officer of SGR, who knowingly and negligently procured substandard crude oil for Plaintiff.

## II. PARTIES

2.      Plaintiff is a limited liability company existing under the laws of the State of Delaware with its principal place of business in Kansas City, Missouri.  Plaintiff is solely and wholly owned by StoneX Group Inc ("StoneX").  StoneX is incorporated in Delaware with its principal place of business in New York.

3.      SGR is a Texas corporation located at 3707 Cypress Creek Parkway, Suite 500, Houston Texas, 77068, doing business in the State of Texas within this district, and can be served with process through its registered agent for service, Thomas San Miguel at its registered office address:  3707 Cypress Creek Parkway, Suite 500, Houston Texas, 77068.   According to SGR's Answer (Dkt. No. 8 at ¶91), SGR is a Texas corporation with its principal place of business in Texas.

4.      STS is a company organized and existing under the laws of Singapore, with a registered office at 1 Temasek Avenue, #34-01 Millenia Tower, Singapore 039132. STS is registered to do business in the United States and has a registered agent in New York, specifically, Corporation Service Company, 80 State Street, Albany, New York, 12207.   According to STS's Response to Show Cause Order [Dkt. No. 47], STS is incorporated and has its principal place of business in Singapore. *Id.* at ¶ 1.

5.      STS is a wholly-owned subsidiary of Glencore International AG, a multinational commodity trading company, headquartered in Baar, Switzerland, with a head office in London, United Kingdom, that is registered to do business in the State of Texas.

6.      San Miguel is an individual who resides in Montgomery, Texas 77356, and has appeared in this lawsuit.

### III.  JURISDICTION AND VENUE

7.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars $75,000.00.   Plaintiff's citizenship, based on its LLC members, includes Delaware and New York.  Defendants are citizens of Texas and Singapore.

8.      Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 1391(b) because: (1) this lawsuit is founded upon a written contract expressly providing for venue in this District; (2) SGR, who owes under the subject contract, is based and doing business in this district; (3) STS controlled the subject commodity and does business in this district; and (4) the voyages and charters at issue originated in this district.

### IV.  FACTUAL BACKGROUND

#### A.  The Parties

9.      Plaintiff is a commodity marketing and arbitrage company. It offers inventory repurchase agreements, transactional commodity financing arrangements, and processing and tolling arrangements.

10.      Defendant SGR is a heavy fuel blending, sales, distribution, marketing and trading company for traditional petroleum commodities and renewable fuels.

11.      STS is a water shipping and transport company.

12.     San Miguel is the Chief Executive Officer ("CEO") of SGR.

**B.  The Agreement**

13.     On or around September 3, 2019, Plaintiff and SGR entered into a Master Purchase and Sale Agreement (hereinafter, the "Agreement") to govern each transaction between Plaintiff and SGR for the purchase and sale of crude or refined petroleum products. *See Master Purchase and Sale Agreement*, attached hereto as **Exhibit 1**.

14.     The Agreement governed transactions between Plaintiff and SGR, whereby Plaintiff would assist SGR in meeting its working capital needs by: (i) purchasing (with a direct cash payment to SGR) inventory held by SGR or aggregating inventory from third parties; and (ii) holding title to all such inventory until SGR could arrange for the purchase of the inventory by an end-buyer.

15.     Under Section 2.4 of the Agreement, once Plaintiff purchased petroleum commodities from SGR or from third parties on behalf of SGR, SGR and Plaintiff would enter into a forward sale contract, whereby SGR would agree to purchase the commodities within a fixed window of time. This structure ensured that, if SGR was unable to find an end-buyer and fulfill its forward purchase obligations, Plaintiff could then market the petroleum commodities directly to third parties without SGR's intervention.

16.     Under the Agreement, although SGR would transport the commodities to a location where it had located an end-buyer, Plaintiff held and maintained valid title to the commodities until SGR paid Plaintiff.  Only then, as a result of the final sale arranged by SGR, would title transfer to the end-buyer.

17.     Under the Agreement, SGR was required to pay Plaintiff for its costs and risks in purchasing the commodities in each transaction, which were priced on the trade dates. *See* **Ex. 1** at Section 2.1(a).

18.     Specifically, under Section 2.1(c) of the Agreement, SGR promised to timely pay against Plaintiff's invoices for specified commodity purchase transactions, including invoices pursuant to the following Sale Contracts for 80,683.2 barrels of domestic crude oil: (1) MIA78169A; (2) MIA78745; and MIA78501 (collectively, the "Confirmations"), attached hereto as **Exhibit 2**, **Exhibit 3**, and **Exhibit 4**, *respectively*.

19.     Per the Confirmations, two voyages were arranged to transport the crude oil: (1) a voyage to load and transport 160,000 barrels from Point Comfort, Texas to Barranquilla, Colombia, which began on April 3, 2020 and was completed and fully discharged on June 15, 2020 (the "First Voyage"); and, (2) a voyage to load and transport an additional 160,000 barrels from Point Comfort, Texas to Barranquilla, Colombia which began on July 9, 2020, but not completed until November 26, 2020 (the "Second Voyage").

20.     Defendant STS was the Commercial Operator and Disponent Owner of the First and Second Voyages, both of which originated in Texas. *See Intertanko Chartering Questionnaire*, attached hereto as **Exhibit 5**.

21.     Specifically, STS contracted with SGR to charter and transport the First Voyage and the Second Voyage from Port Comfort, Texas to Barranquilla, Colombia.

**C.  The First Voyage**

22.     In the Confirmations, Plaintiff and SGR agreed that Plaintiff would sell forward barrels of domestic crude oil (the "Commodity"), for which SGR would arrange a trade and pay Plaintiff.

23.     On April 3, 2020, 160,000 barrels of the Commodity were loaded onto a vessel known as Miss Claudia, IMO: 9293959, MMSI 538004072 (hereinafter, the "Vessel") in Port Comfort, Texas. *See Bills of Lading*, attached hereto as **Exhibit 6**.

24.     STS docked and picked up the Commodity in Port Comfort, Texas. *See* **Ex. 5**.

25.     On April 3, 2020, Plaintiff notified SGR that it was at "maximum account receivable" pursuant to the Agreement, and SGR would need to provide Plaintiff with payment and/or security to release the Vessel when it arrived at its destination in Colombia. *See April 3, 2020 e-mail*, attached hereto as **Exhibit 7**.

26.     Accordingly, and prior to the arrival of the Commodity in Colombia, SGR made a partial payment to Plaintiff, with the remainder owed and due on credit.

27.     On May 20, 2020, Plaintiff informed SGR that to discharge the Vessel, additional security would be required under the Agreement.

28.     On June 11, 2020, in order to discharge the Vessel, SGR agreed to post cash in excess of its credit line.

29.     The Vessel, operated by STS, transported the Commodity from Port Comfort, Texas and discharged the Commodity in Barranquilla, Colombia on June 15, 2020.

30.     On information and belief, SGR delayed discharge of Commodity on the Vessel due to a lack of space at the Barranquilla, Colombia arrival terminal because SGR still held prior inventory of Plaintiff, for which SGR had not yet paid Plaintiff.

**D.  SGR's Nonpayment under the Agreement**

31.     On July 16, 2020, following the discharge of the Commodity from the First Voyage, Plaintiff invoiced SGR $2.4 million, the price of the Commodity.

32.     In response, SGR requested that its June 11, 2020 payment apply against this amount.  Plaintiff agreed in good faith and re-invoiced the amount owed by SGR.

33.     On July 24, 2020, SGR advised Plaintiff that it would be delayed in paying Plaintiff because SGR's own customers were delaying payments. *See 7/24/20 email from SGR*, attached hereto as **Exhibit 8**.  However, under to the Agreement, SGR's issues with its own customers did not excuse its obligations to timely pay Plaintiff.

34.     On July 29, 2020, SGR represented to Plaintiff that Plaintiff would receive payment by July 31, 2020. *See 7/29/20 email from SGR*, attached hereto as **Exhibit 9**.

35.     However, SGR continuously and repeatedly delayed its payment obligations in breach of the Agreement, each time providing false assurances that payment would soon be made. *See Additional E-mails from SGR*, attached hereto as **Exhibit 10**.

36.     In relevant part, the timeline of SGR's payment assurances are as follows:

   a.  July 21, 2020: "We are expecting a payment for the crude this week and will pay this invoice as soon as that is received."

   b.  July 29, 2020: "The payment will be made on Friday. I apologize again for the delay. We are waiting on two big wires that we have been assured we will receive Friday."

   c.  July 31, 2020: "None of the wires I've been waiting on are coming in today ***and I'm very extended…Since late March I've had a lot more going out than coming in…I hope you and FCS will continue to work with me…"***

   d.   August 3, 2020: "I believe we should get enough in this week to pay the balance for the first 80KB."

   e.  September 25, 2020: "I'm trying to get in what I need to get this paid by Wednesday. I apologize for the delay."

37.     On October 1, 2020, a lunch meeting took place between Plaintiff and SGR.  At this meeting, SGR communicated that they would not pay the amount outstanding and owed by SGR to Plaintiff, in breach of the Agreement.

### E.  The Second Voyage

38.     Meanwhile, the Second Voyage had already commenced.  Defendant STS also served as the Commercial Operator for the Vessel of the Second Voyage (the "STS Charter"). *See* **Ex. 5**.

39.     On or about July 9, 2020, the Vessel—operated by STS—was docked and loaded with roughly 160,000 barrels of the Commodity in Point Comfort, Texas, and embarked to Barranquilla, Colombia.  *See* **Ex. 6.**

40.     On July 15, 2020, the Vessel, operated by STS, arrived near Barranquilla, Colombia, but did not dock or discharge its cargo.

41.     STS claimed it could charge demurrage fees in the amount of $17,750 per day, beyond the expiration of 84 hours of laytime following the date on which the freight onboard the Vessel was scheduled to be unloaded.

42.     After the Vessel did not dock or unload on July 15, 2020, STS began calculating significant demurrage fees against SGR.

43.     During this time, STS would not permit the unloading of the Commodity from the Vessel.

44.     As such, the Vessel—and all onboard Commodity—remained near the Swiss Terminal Barranquilla S A S (the "Swiss Terminal") in Colombia.

45.     As of October 7, 2020, the demurrage fees amounted to $1,715,093.75, and continued to accrue. *See Invoice to SGR from STS*, attached hereto as **Exhibit 11**, and *Laytime Calculation attached hereto as* **Exhibit 12**.

46.     Additionally, the cost of the STS Charter was $450,000.00.

47.     SGR was obligated to pay all amounts due for the STS Charter and demurrage fees incurred. Specifically, the Agreement states, "Customer shall be responsible *for **all fees and charges with the In-Transit Commodity, including but not limited to any freight and terminal handling costs, demurrage,*** marine insurance, costs associated with moving the Eligible Commodity into an Approved Storage Tank and any related inland transportation costs…" *See* **Ex. 1**, Section 2.2(h) (emphasis added).   However, because of SGR's failure to pay, and STS's allegedly increasing and excessive fees, irreparable harm and a rapidly depreciating Commodity continued on the Vessel.

### F.  Loss Mitigation Provisions under the Agreement

48.     Pursuant to Section 7.10 of the Agreement, Plaintiff has a duty to mitigate its damages and "use commercially reasonable efforts to minimize any damages it may incur as a result of an Event of Default involving the other Party." *See* **Ex. 1.**

49.     The Agreement also provides that "…the Non-Defaulting Party in its sole discretion shall be entitled to sell, at the Defaulting Party's sole cost and expense, any Applicable Title Document or Bills of Lading associated with any Eligible Commodity in accordance with accepted industry rules and practices…" *See* **Ex. 1, Section 7.8**.

50.     Given SGR's default under the Agreement, Plaintiff was entitled to, and in fact ***required*** to invoke these provisions.

### G.  Default

51.     SGR failed to timely pay and tender to Plaintiff the sum of **$3,059,195.23 USD**, which was validly invoiced and due and owing under the Agreement and the Confirmations (collectively, the "Defaulted Obligations), plus interest at the maximum rate permitted by Section

3.6 of the Agreement. *See Invoice No. 131305 dated 9/3/20*, attached hereto as **Exhibit 13**; *see also*, **Ex. 1** at Section 3.6.

52.    On October 8, 2020, Plaintiff provided SGR with notice of an Event of Default pursuant to Section 7.1 of the Agreement. *See Notice of Default*, attached hereto as **Exhibit 14**.

53.    As of October 16, 2020, SGR remained in default under the Agreement, and as such, Plaintiff provided SGR with a Notice of Early Termination of the Agreement. *See Notice of Early Termination*, attached hereto as **Exhibit 15**.

54.    Moreover, SGR violated the Agreement by failing to pay all Charter costs and demurrage fees allegedly incurred, forcing Plaintiff to pay those amounts under protest, described more fully below.

55.    Under Article 7 of the Agreement, Plaintiff was entitled to immediately liquidate all transactions for the purchase and sale of commodities under the Agreement due to Defendant SGR's breaches. *See* **Ex. 1**.

**H.  The Commodity and Risk of Diminution**

56.    The Commodity on the Vessel (crude oil) is a diminishing asset with a specific shelf life.

57.    Crude oil is subject to spoliation and diminution in value.  Specifically, crude oil always contains a residual amount of water, sulfur and other chemicals. Over long periods, unless sufficiently agitated or stirred on a regular basis, the residual water, sulfur and other chemicals may vaporize and condense on the interior of the Vessel's cargo tanks, causing damage to the Vessel's liner and altering the chemical composition of the crude oil to less valuable, non-marketable quality standards.

58.     Crude oil is also subject to spoliation and diminution in value when exposed to or combined with high levels of oxygenate chemicals. Specifically, when combined with oxygenates, crude oil can erode anything to which it is exposed, including steel tanks in which it is contained, or the liner of the ship on which it is transported.  Such erosion can pervade the crude oil. Oxygenate contamination alters crude oil's chemical composition, rendering it less valuable and out-of-compliance with market quality standards.

59.     Here, given the extended period that the Vessel was anchored near the port of Barranquilla, Colombia—and its warm, tropical climate increasing vaporization—there were legitimate concerns that the Vessel's Commodity was near spoliation, or in fact spoiled.

60.     Moreover, the longer the Commodity was subject to the climate of Colombia—and not discharged—the more likely it became a negative asset with negligible quality or value add. If so, Plaintiff would be forced to dispose of the Commodity in accordance with governing environmental protocols, an extremely costly and time-consuming process that could cause material harm to Plaintiff, Defendants, and very likely, the people of Colombia and the natural environment.

61.     Furthermore, the market for crude oil is uncertain and subject to volatility.  There remained a high degree of price risk in continuing to hold the Commodity aboard the Vessel, which could only be mitigated by selling such quantities as promptly as possible.

62.     Accordingly, Plaintiff sought to test the Commodity on the Vessel prior to unloading the Commodity to ensure it was of a marketable quality and grade, and not subject to disposal.

### I.  Testing the Commodity

63.   Plaintiff repeatedly requested access to test the Commodity, which STS unreasonably delayed.

64.   To test the Commodity, the Vessel could be docked at the Swiss Terminal or moved to a location that would permit an inspection company to access the Vessel.

65.   STS required that SGR sign off on moving or shifting the Vessel to permit testing.

66.   Accordingly, Plaintiff diligently worked with SGR to fulfill STS's requirement, and obtain approval to move the Vessel to facilitate testing.

67.   Around November 4, 2020, SGR agreed in writing that Plaintiff could move the Vessel for testing, at Plaintiff's expense. *See November 4, 2020 Correspondence*, attached hereto as **Exhibit 16**.

68.   Despite SGR's confirmation that the Vessel could be moved for testing, STS continued its delays and required additional confirmations, further delaying the ability to test the Commodity. *See Id.*

69.   As such, SGR again repeated its approval in writing to the arrangement of moving the Vessel at STS's expense. *See Id.*

70.   Once the Commodity was finally tested, despite STS's delays, Plaintiff continued its efforts to promptly unload the Commodity so that Plaintiff could mitigate its damages.

### J.  Dealings with STS

71.   Despite Plaintiff's requests to SGR to pay the relevant costs under the Agreement, SGR refused to pay any costs associated with the STS Charter, while also refusing to pay for the Commodity.

72.     Similarly, STS refused to permit the unloading of the Commodity from the Vessel, which in turn, resulted in additional demurrage fees, the increasing risk of spoliation to the Commodity, and the inability of Plaintiff to procure a buyer for the Commodity.

73.     On or around November 4, 2020, Plaintiff communicated with Counsel for STS to determine whether a commercial resolution was possible.  Among other things, Plaintiff sought to assess the alleged demurrage charges and Charter fees owed by SGR to unload the Commodity.

74.     From November 4, 2020 onward, Plaintiff and STS engaged in confidential settlement discussions to explore the possibility of resolution and immediate unloading of the Commodity.

75.     On or around November 18, 2020, STS received a letter from local authority in Colombia notifying STS that the Vessel had exceeded its lawful time in Colombian territorial waters, and that the Vessel must promptly depart for international waters. *See November 18 Correspondence*, attached hereto as **Exhibit 17**.

76.     Accordingly, on November 19, 2020, Plaintiff promptly requested the costs associated with moving the Vessel, to which Counsel for STS provided wholly inaccurate numbers.

77.     As such, Plaintiff again requested the accurate amount to move the Vessel from Colombian territory.

78.     On November 20, 2020, to once more explore the possibility of resolution prior to moving the Vessel from Colombian territory, Plaintiff extended an offer to resolve the issues between Plaintiff and STS.

79.     Despite time being of the utmost essence, STS failed to respond to, and reject Plaintiff's offer until November 23, 2020—while, upon information and belief, STS continued to increase the fees allegedly owed.

80.     Because of STS's delay in responding to Plaintiff's offer of settlement, Plaintiff was unable to unload the Commodity from the Vessel on the Swiss Terminal's limited and available unloading date of November 23, 2020, causing demurrage fees to continue to increase. Plaintiff repeatedly emphasized that "time is of the essence."

81.     Upon STS's rejection of Plaintiff's settlement offer, on November 23, 2020, Plaintiff requested a ledger of all invoices to unload the Vessel, inclusive of an itemized ledger from STS identifying demurrage fees, as well as payment and wire instructions. *See November 23, 2020 Correspondence*, attached hereto as **Exhibit 18**.

82.     In response, STS stated that Plaintiff "knows the freight and demurrage amounts due", and thus, refused to provide the requested ledger. *Id.*

83.     Plaintiff respectfully advised that if it in fact knew the amount due, Plaintiff would not be requesting it, especially since "[T]ime is of the essence." *Id.*

84.     Finally, at approximately 7:44 PM on November 23, 2020, Plaintiff received invoices from STS, whereby Plaintiff contended the invoices owed and due by SGR to STS amounted to $2,839,223.89. *See Invoices and Correspondence*, attached hereto as **Exhibit 19**.

85.     Plaintiff was shocked by the excessive fees claimed by STS, exceeding $2.4 million, since the Charter costs were only $450,000.  Thus, the alleged fees charged by STS were over **500%** of the initial Charter costs.

86.     Once more, STS's unwillingness to provide pertinent information to allow Plaintiff to properly assess the alleged charges further delayed the unloading of the Vessel and further

increased alleged charges, especially given the Swiss Terminal's limited availability to accommodate the unloading of the Vessel.

87.     Nevertheless, due to the increasing risk of irreparable harm, to pay the invoices, on November 24, 2020, Plaintiff requested STS's W-8 form (which it requested for quite some time).

88.     Plaintiff did not receive STS's W-8 form until 4:34 PM, just twenty-six (26) minutes before the close of business, again delaying the prompt unloading of the Commodity, missing an additional window to unload the Commodity at the Swiss Terminal, and possibly accruing further demurrage fees.

89.     On November 25, 2020, Plaintiff remitted payment under protest to STS via wire, in the amount of $2,892,843.75. *See Wire Confirmation*, attached hereto as **Exhibit 20**.

90.     A day later, on November 26, 2020, the Vessel was unloaded at the Swiss Terminal.

91.     On information and belief, STS purposefully delayed the unloading of the Vessel to profit from the demurrage fees that allegedly accrued since July 15, 2020, taking advantage of the continuing irreparable harm to Plaintiff.

92.     Notably, in discussions with STS, STS admitted that it was more profitable to hold the Vessel near the Swiss Terminal and incur demurrage fees, than to operate in its usual course as a transport and shipping business.  This apparent incentive to extract excessive fees and strong-arm parties like Plaintiff, flatly contradicts the assumed duty to mitigate damages and deal in good faith. The unreasonable delays caused by STS in unloading the Vessel were in bad faith and to STS's own pecuniary gain and benefit.

93.     The following chart illustrates the significant delays caused by STS and SGR, which doubled the voyage time from 73 days to 140 days:

|  | **First Voyage** | **Second Voyage** |
|---|---|---|
| **Commodity** | 160,000 barrels | 160,000 barrels |
| **Commodity Owner** | Plaintiff FCStone | Plaintiff FCStone |
| **Debtor** | Defendant SGR | Defendant SGR |
| **Voyage Operator** | Defendant STS | Defendant STS |
| **Origin** | Point Comfort, Texas | Point Comfort, Texas |
| **Destination** | Barranquilla, Colombia | Barranquilla, Colombia |
| **Begin** | April 3, 2020 | July 9, 2020 |
| **End** | June 15, 2020 | November 26, 2020 |
| **Voyage Time** | 73 days | **140 days** |

**K.  The Midstream Texas Ingleside, LLC Terminal Services Sub-Agreement**

94.     SGR is the Primary Customer under a Master Terminal Services Agreement dated February 1, 2019 (the "MTI Master Agreement") with Midstream Texas Ingleside LLC ("MTI") whereby SGR leased tanks from MTI to store petroleum products ("MTI Leased Tanks"). *See MTI Master Agreement*, attached hereto as **Exhibit 21**.

95.     The MTI Master Agreement requires MTI to use reasonable care in the storage and handling of petroleum products while said product is in the custody of MTI. *See* **Ex. 21** ¶ 14.

96.     Moreover, the MTI Master Agreement holds MTI liable for any contamination, damage, degradation or loss of petroleum products in the MTI Leased Tanks resulting from MTI's negligence or willful misconduct. *See* **Ex. 21** ¶ 15.1.

97.     On or around September 3, 2019, Plaintiff entered into a Terminal Services Sub-Agreement with SGR whereby SGR subleased the MTI Leased Tanks to Plaintiff (the "MTI Sublease Agreement"), making Plaintiff a subtenant of MTI with respect to the MTI Leased Tanks. *See MTI Sublease Agreement*, attached hereto as **Ex. 22**.

98.     The MTI Sublease Agreement requires Plaintiff and/or SGR to indemnify and hold harmless the other party from any third party claims, liabilities, and damages. *See* **Ex. 22** ¶ 10.

99.     MTI agreed to the MTI Sublease Agreement as memorialized by the Consent to Terminal Services Sub-Agreement entered into on September 3, 2019 between Plaintiff, SGR and

MTI (the "MTI Consent Agreement"). *See MTI Consent Agreement*, attached hereto as **Exhibit 23**.

100.    Plaintiff, SGR and MTI agreed, by way of the MTI Consent Agreement, that Plaintiff is the owner of and holds title to all petroleum product in the MTI Leased Tanks. *See* **Ex. 23** ¶ 3.

101.    Plaintiff, SGR and MTI further agreed that SGR was not released or discharged from any if its covenants, duties, agreements or liabilities under the MTI Master Agreement. Namely, SGR was required to deliver product of a certain quality to the MTI Leased Tanks. *See* **Ex. 23** ¶ 3.

102.    The Consent Agreement mandates that MTI shall, at its own expense, maintain and carry insurance in full force and effect for coverage against casualty loss, including but not limited to commercial general liability, automobile liability, environmental, and umbrella or excess liability and reflecting FMS as an additional insured on a primary and non-contributory basis, with at least $5,000,000 in coverage per occurrence. *See* **Ex. 23** ¶ 3.

**L.   The Stored Crude Oil in the MTI Leased Tanks**

103.    SGR and San Miguel sourced crude oil from various petroleum providers and transported it to the MTI Leased Tanks via rail and/or truck ("MTI Stored Crude Oil").

104.    SGR and San Miguel assured Plaintiff that the MTI Stored Crude Oil was of industry standard quality.

105.    SGR and San Miguel further assured Plaintiff that the MTI Stored Crude Oil was tested for any contamination and was devoid of any traces of the same.

106.    Relying on SGR and San Miguel's representations, Plaintiff routinely purchased the MTI Stored Crude Oil once it was transferred and combined into the MTI Leased Tanks.

107.    SGR and San Miguel advised that it used Amspec Services LLC ("Amspec") to conduct testing of the crude oil it sourced, transported and transferred into the MTI Leased Tanks.

108.    On or around September 14, 2020, SGR first put Plaintiff on notice that the MTI Stored Crude Oil did not meet proper specifications with respect to its viscosity and other quality issues. *See September 14th and 21st Correspondence*, attached hereto as **Exhibit 24**.

109.    Similarly, on or around September 21, 2020, SGR first put Plaintiff on notice that the MTI Stored Crude Oil did not meet proper specifications with respect to its total acid number ("TAN"), but San Miguel, on behalf of SGR, advised that the issues with the TAN specifications "shouldn't be a problem." *See Id.*

110.    On or around October 1, 2020, representatives from FMS and SGR met in person, where SGR contended the TAN specification issues in the MTI Stored Crude Oil could still be resolved by working with Amspec.

111.    At that same meeting, SGR stated that Amspec had consistently been testing the MTI Stored Crude Oil, and the deficiency in TAN specifications had showed up just recently.

112.    On October 7, 2020, Plaintiff received results from testing it requested on the MTI Stored Crude Oil in the MTI Leased Tanks from Amspec, which revealed that the MTI Stored Crude Oil was contaminated.

113.    More specifically, Amspec's test results revealed that the MTI Stored Crude Oil was contaminated with oxygenates and thus, has suffered a severe and material diminution in value.

114.    On information and belief, San Miguel had knowledge of the contamination of the MTI Stored Crude Oil upon sourcing, transporting and transferring same into the MTI Leased Tanks.

115.     On information and belief, the cause of the contamination to the MTI Stored Crude Oil originated from quantities that SGR and San Miguel sourced from petroleum providers.

**M. The Texas Flow Tankage, LLC Services Agreement**

116.     On November 1, 2019 SGR entered into a Terminaling, Storage and Throughput Services Agreement (the "TFT Master Agreement") with Texas Flow Tankage, LLC ("TFT") whereby SGR leased tanks from TFT to store petroleum products (the "TFT Leased Tanks"). *See TFT Master Agreement*, attached hereto as **Exhibit 25**.

117.     The TFT Master Agreement requires TFT to use commercially reasonable efforts to maintain the facility in good working order in accordance with industry standards and applicable law, and sets forth a quality determination for all crude oil received by trucks. *See Id*. at ¶ 19.

118.     The TFT Master Agreement further requires both TFT and SGR to maintain Commercial General Liability Insurance Coverage with limits of not less than $3,000,000.00 per occurrence and annual aggregate. *See Id*. at ¶ 18.

119.     On November 1, 2019, Plaintiff and SGR entered into a sublease agreement whereby SGR subleased the TFT Leased Tanks to Plaintiff (the "TFT Sublease Agreement"). *See TFT Sublease Agreement*, attached hereto as **Exhibit 26**.

120.     The TFT Sublease Agreement requires SGR to indemnify and hold harmless Plaintiff from any third party claims, liabilities, and damages. *See* **Ex. 26 ¶** 10.

121.     TFT agreed to the TFT Sublease Agreement as memorialized by the Consent to Terminal Services Sublease Agreement entered into on November 1, 2019 between Plaintiff, SGR and TFT (the "TFT Consent Agreement"). *See TFT Consent Agreement*, attached hereto as **Exhibit 27**.

122.     Plaintiff, SGR and TFT agreed, by way of the TFT Consent Agreement, that Plaintiff is the owner of and holds title to all petroleum product in the TFT Leased Tanks. *See* **Ex. 27** ¶ 3.

123.     Plaintiff, SGR and TFT further agreed that SGR was not released or discharged from any if its covenants, duties, agreements or liabilities under the Primary Agreement. *See Id.* ¶ 4.

### N.  The Stored Crude Oil in the TFT Terminal

124.     SGR and San Miguel sourced crude oil from various petroleum providers and transported it to the TFT Leased Tanks via rail and/or truck ("TFT Stored Crude Oil").

125.     SGR and San Miguel assured Plaintiff that the TFT Stored Crude Oil was of industry standard quality.

126.     On September 19, 2019, SGR provided Plaintiff with information related to the quality of the TFT Stored Crude Oil.

127.     SGR and San Miguel further assured Plaintiff that the TFT Stored Crude Oil was tested for any contaminations and was devoid of any traces of the same.

128.     Relying on SGR and San Miguel's representations, Plaintiff would purchase the TFT Stored Crude Oil once it was transferred into the TFT Leased Tanks.

129.     SGR and San Miguel advised that it used Amspec to conduct testing of the crude oil it sourced, transported and transferred into the TFT Leased Tanks.

130.     On or around October 7, 2020, Plaintiff requested that Amspec conduct testing on the TFT Stored Crude Oil.

131.     On or around October 9, 2020, Plaintiff received preliminary results from the testing of the TFT Stored Crude Oil, and as a result, additional testing was requested.

132.     On or around October 14, 2020 and October 19, 2020, Plaintiff received test results showing that the TFT Stored Crude Oil was contaminated.

133.     More specifically, Amspec's test results revealed that the TFT Stored Crude Oil was contaminated with oxygenates and thus, has suffered a severe and material diminution in value.

134.     On information and belief, San Miguel had knowledge of the contamination of the TFT Stored Crude Oil upon sourcing, transporting and transferring the same into the TFT Leased Tanks.

135.     On information and belief, the cause of the contamination to the TFT Stored Crude Oil originated form the material that SGR and San Miguel sourced from petroleum providers.

**O.  SGR's Financial Condition**

136.     SGR's financial instability creates additional concerns as it is entirely unclear when SGR will pay for the Commodity pursuant to the Agreement, and as discussed above, SGR failed to pay for the Charter cost and demurrage fees incurred to permit the proper discharge of the Vessel.

137.     Indeed, SGR has no plausible plans to pay Plaintiff under the terms of the Agreement.

138.     Dunn & Bradstreet, a resource accessible to the public, has rated SGR as a "high risk level," with "significant financial stress and behavior concerns" and "very high potential for severely delinquent payments." *See D&B Report*, attached hereto as **Exhibit 28**.

139.     Moreover, through correspondence and oral communications, Defendant SGR has advised it is near insolvent.

### P.  San Miguel's Business Practices

140.    San Miguel is the CEO of SGR, a company which he started in 2011 with investor seed capital.

141.    SGR is said to have increased its revenue to over $170 million in 2018.

142.    On information and belief, SGR made $17 million in profits for the calendar year of 2019.

143.    Despite SGR's alleged and impressive profit margins, SGR has expressed that it is insolvent and has virtually no assets.

144.    On information and belief, San Miguel is presently in Panama, and for extended periods of time has been unreachable.

145.    Thus, it is possible San Miguel has absconded with the profits of SGR and is now, or in the immediate future, transferring funds into offshore accounts, rendering SGR totally insolvent after directing SGR to engage in the purchase and sale of unmerchantable, contaminated crude oil with Plaintiff.

146.    Moreover, it is highly possible San Miguel drained his capital, and/or the capital of SGR to avoid making payment for the Charter costs, demurrage fees, and all other amounts owed and accruing under the Agreement.

147.    Additionally, San Miguel, on behalf of SGR, has represented to Plaintiff on numerous occasions that he had potential buyers with respect to the Commodity onboard the Vessel.

148.    However, San Miguel continuously delayed and refused to identify the potential buyers he allegedly procured to purchase the Commodity onboard the Vessel.

## V.  CAUSES OF ACTION

### A.  Count One: Breach of Contract by SGR

149.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

150.    Plaintiff and SGR entered into a valid and enforceable contract for the purchase and sale of crude or refined petroleum products memorialized by the Agreement and subsequent Confirmations, as defined above. *See* **Exs. 1, 2, 3 and 4.**

151.    SGR breached the Agreement by failing to pay amounts due and owing under the Agreement.

152.    As a result of Defendant's breach, Plaintiff has suffered damages including, but not limited to, amounts owed under the Agreement, losses sustained for diminishing assets, losses sustained for mitigating its damages under the Agreement, attorney's fees, interest and costs.

### B.  Count Two: Attorneys' Fees as to SGR

153.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

154.    Plaintiff is entitled to recover reasonable and necessary attorney's fees under the Agreement and Texas Civil Practice and Remedies Code Chapter 38 because Plaintiff has asserted claims for breach of contract.

155.    Moreover, the Agreement provides for the recovery of all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party. *See* **Ex. 1**, Sections 7.9, 7.11 *et. seq*.

### C.  Count Three: Negligent Misrepresentation as to SGR and San Miguel

156.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

157.   SGR and San Miguel made representations related to SGR's payment and subsequent nonpayment under the Agreement, and related to potential buyers of the Commodity.

158.   SGR and San Miguel continuously made false statements related to their ability to pay for the Commodity pursuant to the Agreement.

159.   SGR and San Miguel failed to exercise competence or reasonable care when communicating its ability to pay to Plaintiff.

160.   Plaintiff justifiably relied on SGR and San Miguel's representations and promises to make payment under the Agreement, especially their promises that, once they received payment from its alleged other customers, they would promptly remit payment to Plaintiff.

161.   SGR and San Miguel had a pecuniary interest in making representations related to their promised payment under the Agreement.

162.   Plaintiff suffered losses of payment for over 80,000 barrels of crude oil, in addition to interest and costs in relying on San Miguel and SGR's misrepresentations.

163.   San Miguel and SGR further made representations with respect to the quality of the crude oil it procured and delivered to the TFT and MTI Leased Tanks.

164.   San Miguel and SGR provided Plaintiff with false information with respect to the quality of the crude oil they procured and delivered to the TFT and MTI Leased Tanks.

165.   In relying on San Miguel and SGR's representations that they obtained testing of the crude oil in addition to their representations related to the quality of the crude oil, Plaintiff purchased the crude oil.

166.   San Miguel and SGR did not exercise reasonable care or competence in obtaining or communicating the information related to the quality of the crude oil to Plaintiff.

167.    Plaintiff suffered, and continues to suffer pecuniary loss by justifiably relying on San Miguel and SGR's representations in that Plaintiff purchased subgrade domestic crude oil product for a value much higher than its worth.

**D.  Count Five: Conversion as to STS**

168.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

169.    Plaintiff had valid title to, owned and was entitled to possession of the Commodity.

170.    STS assumed and exercised dominion over the Commodity, by transporting the Commodity onboard the Vessel from Texas.

171.    Plaintiff made repetitive demands for access to, and the unloading of the Commodity, to which STS continuously and purposefully delayed.  STS's actions in refusing to unload the Commodity clearly repudiated Plaintiff's rights.

172.    STS's actions in delaying Plaintiff's access to the Commodity for prompt testing and unloading—including after Plaintiff's demands, were inconsistent with Plaintiff's rights and title to the Commodity.

173.    Plaintiff incurred substantial damages, including but not limited to, unreasonable demurrage fees it paid under protest, the Charter cost it paid under protest, lost value in the Commodity, and additional fees and costs.

**E.  Count Six: Money Had and Received as to STS**

174.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

175.    STS transported the Commodity onboard the Vessel from Texas.

176.    To unload the Commodity after its voyage from Texas, Plaintiff was forced to pay demurrage fees and the Charter cost in the amount of $2,892,843.75.  Upon information and belief, this amount was excessive, unlawful, and not in fact incurred by STS.  Further, to extract excessive and unlawful fees from Plaintiff, STS took advantage of the pending irreparable harm to Plaintiff and its depreciating Commodity.

177.    STS actively delayed Plaintiff's efforts to unload the vessel to obtain additional and unlawful demurrage fees for its own pecuniary interest.

178.    As a result of Plaintiff's payment for the Charter cost and demurrage fees to STS, STS holds money of the Plaintiff; and,

179.    The money paid by Plaintiff to STS in equity and good conscience belongs to the Plaintiff.

**F.  Count Seven: Unjust Enrichment as to STS**

180.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

181.    STS transported the Commodity onboard the Vessel from Texas.

182.    To unload the Commodity after its voyage from Texas, Plaintiff remitted payment under protest to STS for demurrage fees and Charter costs.  Upon information and belief, this amount was excessive, unlawful, and not in fact incurred by STS.  Further, to extract excessive and unlawful fees from Plaintiff, STS took advantage of the pending irreparable harm to Plaintiff and its depreciating Commodity.

183.    STS unreasonably delayed the unloading of the Vessel to incur additional demurrage and Charter costs at the expense of Plaintiff.

184.    STS received and obtained the payment made by Plaintiff.

185.    Plaintiff's payment unjustly benefited STS to the detriment of Plaintiff.

186.    STS's was unjustly enriched by the Plaintiff's payment.

**G.  Count Eight: Negligent Misrepresentation as to STS**

187.    Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

188.    STS transported the Commodity onboard the Vessel from Texas.

189.    During its voyage from Texas, STS made representations related to, among other things, the ability to unload and provide access to Plaintiff's crude oil, the timing and delays regarding the unloading and testing of Plaintiff's crude oil, and the amount of demurrage fees and Charter costs incurred by STS and allegedly owing.

190.    STS supplied Plaintiff with false information with respect to, among other things, the ability to unload and test Plaintiff's crude oil, the timing and delays regarding the unloading and testing of Plaintiff's crude oil, and the amount of demurrage fees and Charter costs incurred by STS and allegedly owing.  Upon information and belief, the amount was excessive, unlawful, and not in fact incurred by STS.  Further, to extract excessive and unlawful fees from Plaintiff, STS intentionally delayed the unloading of the Commodity and took advantage of the pending irreparable harm to Plaintiff and the depreciating Commodity.

191.    STS failed to exercise competence or reasonable care when communicating information to Plaintiff.

192.    STS had a pecuniary interest in making the representations related to the unloading of Plaintiff's crude oil and the amount of demurrage fees and Charter costs.

193.    Plaintiff justifiably relied STS's representations.

194.     Plaintiff suffered, and continues to suffer pecuniary loss, by justifiably relying on STS's representations.

**Count Nine: Declaratory Judgment as to SGR and STS**

195.     Plaintiff hereby incorporates the allegations set forth above as if fully set forth herein.

196.     Pursuant to 28 USCS § 2201(a), "[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration…" *See* 28 USCS § 2201(a).

197.     The Declaratory Judgment Act is a procedural device that requires the existence of a justiciable controversy. *Murphy v. HSBC Bank USA*, 2017 U.S. Dist. LEXIS 11948 at *42-43, 2017  WL 393595 (S.D. Tex. 2017).

198.     "In order to demonstrate a case or controversy exists…the plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).

199.     An actual case or controversy exists between the parties, within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

200.     A justiciable controversy exists because Plaintiff has made payment under Protest, for which SGR and STS have refused to reimburse to Plaintiff.

201.     Plaintiff and SGR are parties to the Agreement.   Under section 7.10 of the Agreement, Plaintiff had a duty to mitigate its damages and "use commercially reasonable efforts to minimize any damages it may incur as a result of an Event of Default involving the other Party."

202.    Based on Section 7.10 of the Agreement, Plaintiff paid STS's allegedly increasing and excessive fees, under protest, to mitigate damages and avoid continuing irreparable harm and the risk of a depreciating Commodity.  It is also likely that STS may demand further fees from Plaintiff or SGR related to the Commodity.

203.    Plaintiff requests a declaration that SGR and STS, not Plaintiff, are responsible: (i) to reimburse Plaintiff for the excessive fees paid under protest to mitigate damages; and (ii) to pay any future fees that STS claims is owed by Plaintiff related to the Commodity.

204.    Because the rights, status, and legal relations of the Plaintiff, SGR, and STS are affected by the Agreement, including Section 7.10, the Court may declare the rights of these Parties in connection with the Agreement.  *See* 28 USCS § 2201(a).

## VI.  CONDITIONS PRECEDENT

205.    All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## PRAYER

**WHEREFORE**, Plaintiff prays that this Court:

i.    Enter judgment against Defendants on each count of this Complaint;

ii.    Award Plaintiff its actual and consequential damages and, where applicable, restitution;

iii.    Award Plaintiff its reasonable and necessary attorneys' fees incurred in or related to this action;

iv.    Award Plaintiff its pre- and post-judgment interest at the highest rate allowable by law;

v.    Award Plaintiff interest permitted at the maximum rate pursuant to the Agreement;

vi.    Award Plaintiff its costs of court; and,

vii.   Grant all other and further relief both in law and in equity to which Plaintiff may show itself justly entitled.

Dated this 30th day of July, 2021.              Respectfully submitted,

*/s/ Yasser A. Madriz*
**Yasser A. Madriz (lead attorney)**
State Bar No. 24037015
Federal Bar No. 39080
ymadriz@mcguirewoods.com
**Miles O. Indest**
State Bar No. 24101952
Federal Bar No. 3070349
mindest@mcguirewoods.com
**McGuireWoods LLP**
600 Travis Street, Suite 7500
Houston, Texas 77002
T: 713-353-6681
F: 832-255-6381

**Addison E. Fontein**
State Bar No. 24109876
Federal Bar No. 3530304
afontein@mcguirewoods.com
**McGuireWoods LLP**
2000 McKinney Ave., Suite 1400
Dallas, Texas 75201
T: 214-932-6436
F: 469-372-3891

***ATTORNEYS FOR PLAINTIFF, FCSTONE MERCHANT SERVICES, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2021, a true and correct copy of the foregoing document was served via ECF to:

**D. Mitchell McFarland**
**J. Mark Deaton**
Munsch Hardt Kopf & Harr, PC
700 Milan Street #2700
Houston, Texas 77002
mmcfarland@munsch.com
mdeaton@munsch.com
*Attorneys for Defendants, SGR Energy, Inc.*

**Robert C. Oliver**
**Sharpe & Oliver, LLP**
5535 Memorial Drive, No. F570
Houston, Texas 77007
macknife@macknife.net

**John R. Keough, III (admitted Pro Hac Vice)**
**George Cornell (admitted Pro Hac Vice)**
**Sigal Markowitz (admitted Pro Hac Vice)**
Clyde & Co. US LLP
405 Lexington Avenue
New York, New York
John.Keough@clydeco.us
George.Cornell@clydeco.us
*Attorneys for Defendant,*
*ST Shipping & Transport PTE LTD*

*/s/ Yasser A. Madriz*
**Yasser A. Madriz**